# EXHIBIT 1

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


Civil Action No. 3:21-MC-00074-FAB

- - - - - - - - - - - - - - - - - - - -
UNITED STATES OF AMERICA,          *
                                   *
                                   *
              Plaintiff,           *
                                   *
              vs.                  *
                                   *
KENDELL LANG, et al.,              *
                                   *
              Defendants.          *
                                   *
FUSION PROPERTIES MANAGEMENT GROUP, *
INC., d/b/a FUSION FARMS,           *
                                   *
              Garnishee.           *
------------------------------------*



        The 30(b)(6) remote Zoom deposition of

FUSION PROPERTIES MANAGEMENT GROUP, INC., d/b/a

FUSION FARMS, through its designated

representative, ELIOT F. PRATT, called as a

witness by the plaintiff, before Notary Public

Saul Berrios, Esquire, and Dennis Zambataro,

certified and Registered Professional Reporter,

commencing at 9:01 o'clock a.m., on December 9,

2021.

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                      Page 9

```
 1
 2
 3
 4
                              Redacted
 5
 6
 7
 8
 9                            ELIOT PRATT
10    was called as a witness by the plaintiff,
11    having been first duly sworn, was examined and
12    testified as follows:
13              MR. DOYLE:  Okay.  So let's start
14         again.
15                            EXAMINATION
16    BY MR. DOYLE:
17         Q.   So, Mr. Pratt, you live on Front
18    Street in New York?
19         A.   Yes.
20         Q.   And you're one of the -- did you
21    state what your role is?
22         A.   I said "acting director of finance."
23         Q.   Acting director of finance.
24              How long have you been acting
25    director of finance?
```

1       A.   Since about six months.

2       **Q.   So that was in May?**

3       A.   Yes.

4

5

6

7

8

9

10

11

12

13

14

15                          Redacted

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 43

1

2                                  Redacted

3

4        Q.    Okay.  How many bank accounts does

5   the company have?

6        A.    It has a bank account at Oriental

7   Bank, and I am working to form a new bank

8   account in New York City just because Oriental

9   is not a sophisticated bank.

10        Q.    But this year so far, the only bank

11   account is at Oriental Bank?

12        A.    There's also a bank account -- I

13   forget the other name of it -- but all of the

14   company's activities go through Oriental Bank.

15        Q.    Well, when you say there's another

16   bank; what is that?

17        A.    I would have to look it up.  It's

18   another Puerto Rico bank.

19        Q.    Does your company have an account

20   there.

21        A.    Yes.

22              I'm sorry.

23        Q.    No rush.

24        A.    It has an account at First Bank.

25        Q.    Did you find it?

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 44

```
 1              A.    It's called First Bank.
 2              Q.    Oh, First Bank?
 3              A.    Yes.
 4              Q.    And that's a Puerto Rico bank?
 5              A.    Yes.
 6              Q.    Do you know what the balance is in
 7      the accounts now, approximately?
 8              A.    Approximately between Oriental and
 9      First Bank, the balance is approximately
10      600,000.
11              Q.    Besides those two bank accounts,
12      does Fusion Farms have any other financial
13      assets?
14              A.    No.
15
16
17
18
19
20                          Redacted
     Redacted
21
22                       Redacted
23
24
25                      Redacted
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10                              Redacted
11
12
13
14
15
16
17
18
19
20          Q.   Sure.  Okay.
21               So Subject Matter Number 10; do you
22     know of any money that's gone to Lisa Jander or
23     Kendell Lang from the company for whatever
24     reason?
25               A.   To Kendell Lang, only the
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                          Page 56

```
1    reimbursement of expenses.
2              And to Lisa Jander, she has been on
3    payroll in 2021 so she receives $3,000 a month
4    as payroll.
5         Q.   Okay.  So is that the only money
6    that she receives from the company?
7         A.   Yes.
8         Q.   Reimbursements to Mr. Lang, did they
9    take place after the company was served with a
10   writ of garnishment?
11        A.   I'm going to say no.  The ones that
12   I'm aware of are in June -- well, the ones that
13   I'm aware of are in June.
14        Q.   Yeah.  Well, the garnishment was in
15   March; is that right?
16        A.   Who are you asking?
17        Q.   You.
18        A.   The needs have occurred subsequent
19   to that.
20        Q.   So besides reimbursements,
21   Kendell Lang received nothing from the company?
22        A.   Correct.
23
24                    Redacted
25
```

```
 1
 2
 3
 4
                         Redacted
 5                                                    e
 6
 7
 8
 9          Q.    All right.  How about David
10   Friedland?
11          A.    I know he is the trustee of
12   Roundtable and that he is successor to Michael
13   Anthony Francis in that role.  I know that he's
14   85 and in very poor health.  That's about all I
15   know about him.
16          Q.    Do you know if -- is he an American
17   citizen?
18          A.    I don't know.  My understanding is
19   that he's a Bahamian citizen.
20          Q.    Do you know what Mr. Friedland's
21   occupation is?
22          A.    The answer is no, I don't know.
23   He's 85 so I -- I believe that he's retired from
24   any formal occupation.
25          Q.    Okay.  Do you know what his formal
```

1   occupation may have been?

2          A.   I apologize, I don't know.

3          Q.   Have you talked to him?

4          A.   No.

5          Q.   How do you know about him?

6          A.   I asked Mr. Lang about him and he

7   told me.

8          Q.   Okay.  Do you know what roles

9   Mr. Friedland has played in Fusion Farms over

10  the years?

11         A.   I've never had interaction with him.

12  I know that he became the trustee only after the

13  death of Mr. Francis.

14         So my answer from personal knowledge

15  is that he has no interaction, no role in the

16  management of Fusion Farms.

17         Q.   Do you know when Mr. Francis died?

18         A.   In my notes, my notes say that

19  Friedland took over in July of '21, so I believe

20  that Mr. Francis died sometime shortly before

21  that.

22         Q.   Subject Matter Number 14 is about

23  credit cards.

24         Did you look into that?

25         A.   So there's one -- oh, I see that

1   you -- you've cited it, yes.

2            So we looked into the payment of

3   $5,303.51 and it was for the purchase and

4   installation of a refrigerated display case that

5   we have at the business location.

6        Q.   And the credit card is in whose

7   name?

8        A.   So USAA, I know, is Kendell's

9   personal card and so this was a direct

10  reimbursement for a purchase of a piece of

11  equipment that's used in the business.

12       Q.   Right.  It was paying debt to

13  Kendell Lang, right?

14       A.   Yes.

15       Q.   Do you know who made the decision to

16  pay him that?

17       A.   Well, Anabelle, as president, would

18  make the decision to reimburse.

19       Q.   Was he the president in June?

20       A.   So he was still acting under his

21  contingent consulting agreement at that time.

22  So, yes.

23

24                    Redacted

25

1

2

3

4

                                    Redacted
5

6

7

8

9          Q.   So the Supplemental Answer to Joint

10    Exhibit 1, if you go -- staying in Exhibit 7 --

11          A.   Yeah.

12          Q.   -- it says:

13          "The company was essentially a paper

14    company or empty vessel which had no ongoing

15    operations during the first few years, had no

16    employees, no business operations, no investors, no

17    payroll and no bank account."

18               Is that entirely accurate?

19          A.   Yes.

20          Q.   So it did not have any investors?

21          A.   Other than Roundtable.

22          Q.   Well, no is none and Roundtable is

23    one.

24               So it did have an investor; is that

25    right?

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 66

```
 1          A.   Yes.
 2          Q.   Okay.  And what was it doing in
 3     those years from 2016 going forward?
 4          A.   Again, speaking from my own
 5     experience in the business, it's a complicated
 6     engineering Feat to grow plants indoors from
 7     physics and chemistry points of view.
 8               So during those years, a prototype
 9     was being explored; different techniques of
10     growing indoor plants were being explored; the
11     physics of moving water; the electricity
12     required to power LED lights; the understanding
13     of how this complicated piece of equipment would
14     be built and built successfully.
15               So there was much research and
16     experimentation around building an indoor farm.
17          Q.   Now, where did you get that
18     information?
19          A.   Well, I have asked Mr. Lang and Lisa
20     about the early days of the company and they
21     were working to determine the best --
22          Q.   So there was a lot of
23     experimentation.
24          A.   Yes.
25          Q.   So it was not really a paper
```

```
1      company, right?  I mean, it was actually doing

2      a lot of, you know, preoperational work.

3           A.   I --

4           Q.   What's that?

5           A.   I agree with your statement.  It was

6      engaged in a lot of research and work on how

7      such a piece of equipment would be built.

8           Q.   But it was not just some corporation

9      sitting on a shelf; there was active attempts to

10     get something up and running.

11          A.   I don't disagree with your

12     statement.

13          Q.   Okay.  So this is going on for years

14     with Mr. Lang in charge of it and there was

15     nothing paid at all?

16          A.   Correct.

17          Q.   Do you know why?

18          A.   I -- he has retired from an earlier

19     business, a currier, so I assume that he had at

20     least assets enough to not be destitute and he

21     was interested in building a sustainable

22     agriculture company.

23               And so while the company did not

24     have cash, he was not taking any salary and,

25     indeed, has stated his intention during those
```

1    years not to take a salary; that he was more

2    interested in building this business.

Redacted

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                              Page 69

Redacted

11      Q.   Okay.  So look at -- staying in

12   Exhibit Number 7, Supplemental Answer to

13   Interrogatories Number 8.  Interrogatory No. 8

14   asks:

15        "Identify every financial account owned by

16   Fusion Farms for which Kendell Lang and/or Lisa

17   Jander has had access."

18           And this says that Oriental Bank --

19   Mr. Lang is no longer an authorized signer, but

20   that you and Anabelle Morales are; is that

21   accurate?

22      A.   It's accurate to say that we have

23   been to Oriental Bank in order to become

24   signatories and because we're not residents of

25   Puerto Rico, they did not allow us to become

1    signatories.

2              And that is why I am speaking to

3    Citibank in New York City to open a bank account

4    on behalf of the company so that the company has

5    an operating account that Anabelle and I can be

6    signatories of.

7         Q.   Well, who has access to the money in

8    the account now?

9         A.   Mr. Lang operates on the instruction

10   of Anabelle --

11        Q.   So where it says "authorized

12   signatories do not include Mr. Lang or

13   Ms. Jander," he actually was in control of the

14   bank account.

15        A.   I'm speaking to my knowledge that

16   I've been to Oriental trying to become a

17   signatory.

18        Q.   They wouldn't let you be a

19   signatory?

20        A.   Right.

21        Q.   And that remains unchanged and

22   Mr. Lang can still write checks or make debits

23   from the account, right?

24        A.   At the instruction of Anabelle.

25        Q.   Well, will he be able to do it, if

1    not legally, would he be able to do it without

2    her instruction?

3            A.    I have to say yes.

4            Q.    Okay.  Now, does he actually make

5    payments on behalf of the company when she

6    directs him to?

7            A.    Yes.

8            Q.    Okay.  So he's still actively

9    engaged in using the company's bank account.

10           A.    Because Oriental Bank is --

11           Q.    No, no, I'm not talking about --

12               MR. SANCHEZ:  Let him finish,

13           Mr. Doyle.  You're interrupting him.  Let

14           him finish.

15               Go ahead, Mr. Pratt, finish your

16           answer:  "Because Oriental," you were

17           saying?

18               THE WITNESS:  I'm trying to make the

19           general point that Oriental Bank, because

20           it's -- because of its rather antiquated

21           policies are having difficulty getting

22           myself and Anabelle as signatories.

23               But that is the intention that I

24           have with Oriental bank to do that and

25           that Kendell, Mr. Lang, only executes

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                      Page 72

```
 1              orders from the bank to extend his order
 2              to by Anabelle [verbatim].
 3    BY MR. DOYLE:
 4              Q.   Do you know if she's in contact with
 5    him on a regular basis?
 6              A.   Yes.  His expertise is -- was used
 7    during the building of the prototype and
 8    determining the strategy of the company and --
 9    and he is a valuable resource.
10              Q.   Well, but not just a resource; he
11    actually has --
12              A.   Until we fix this bank account
13    problem, yes.
14              Q.   So how about First Bank?  Is First
15    Bank -- do you have signing authority at First
16    Bank?
17              A.   Not yet.  Same answer.
18              Q.   So Mr. Lang has access to a total of
19    about $600,000 of Fusion Farm's money.
20              A.   Yes.
21              Q.   Okay.  And the company doesn't --
22              A.   I take it --
23              Q.   -- is that right?
24              A.   I'm just going to say yes because
25    you're technically accurate.
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 73

1       Q.    Okay.  So going back to Exhibit

2    Number 7, the Answer to Interrogatory 8 where it

3    says "Oriental bank is the only account," that's

4    not accurate; it's also the First Bank -- the

5    account at First Bank; is that right?

6       A.    Yes.

7       Q.    Okay.  Does the company have any

8    credit cards?

9       A.    No.

10       Q.    Does it have any other ways of

11    paying its bills?

12       A.    It can write checks.

13       Q.    Well, Mr. Lang can write checks,

14    right?

15       A.    The company pays bills to its

16    vendors and employees.

17       Q.    Right.  Is that through the bank

18    account?

19       A.    Yes.  Oriental Bank.

20       Q.    Okay.  Does Roundtable pay expenses

21    associated with Fusion Farms directly?

22       A.    No.

23       Q.    Do any other persons or entities?

24       A.    Only incidental expenses.  You know,

25    speaking for myself, I -- when I fly to

1    Puerto Rico, I'm reimbursed for that expense,

2    for example.

3           **Q.   Who reimburses you?**

4           A.   I ask Anabelle and she instructs

5    Mr. Lang to make a reimbursement.

6           **Q.   And how is that effected; is that**

7    **through a check or is that through an ACH or**

8    **what?**

9           A.   ACH.

10          **Q.   What loans has this company**

11   **received?**

12          A.   What loans?

13          **Q.   Yes.**

14          A.   So in my time, there have been no

15   loans.  The investors are all direct equity

16   investors.  I know that Mr. Lang has loaned the

17   money -- loaned the company money in the form of

18   expenses reimbursed -- expenses for equipment,

19   purchases of equipment.

20               So I'm only aware of relatively

21   small-dollar loans from Mr. Lang to the company

22   in connection with purchasing equipment and

23   building the farm.

24           Redacted

25                    Redacted

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 75

1

2

3

4
                              Redacted
5

6

7

8

9          Q.   As acting director of finance,

10    shouldn't you be aware of all outstanding loans?

11         A.   Yes, sir, I should be.

12         Q.   Okay.  Are there other loans?

13         A.   I'm aware of a loan made by Mr. Lang

14    to the company relating to the purchase of

15    equipment.

16         Q.   How much was that?

17         A.   On our balance sheet, it's about

18    $150,000; I don't know the exact number.

19         Q.   Do you know when that occurred?

20         A.   Prior to -- prior to my engagement

21    with the company.

22         Q.   Right, but --

23         A.   So 2020?

24         Q.   Are you guessing 2020?

25         A.   I'm guessing 2020.

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                        Page 76

```
 1            Q.    Okay.  Is that -- is that
 2      memorialized in a note?
 3            A.    It's an answer I should know, but I
 4      don't know the answer, I've seen our balance
 5      sheet.
 6
 7
 8                            Redacted
 9
10
11
12            Q.    If there were any paperwork
13      associated with the loan, where would that be?
14            A.    With our bookkeeper, who is a local
15      CPA.
16            Q.    Who is that?
17            A.    Her name is Cynthia Rijo, R-I-J-O.
18            Q.    What does Ms. Rijo do for you -- do
19      for the company?
20            A.    Bookkeeping and preparation of
21      financial statements and tax filing and payroll
22      administration.
23
24                            Redacted
25
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 78

```
 1                           Redacted

 2            Q.    So on page 6 of Exhibit 7,

 3      Supplemental Response to Request Number 7.

 4                  Do you see that?

 5            A.    Page --

 6            Q.    Page 6?

 7            A.    Yes, I'm on page 6.

 8            Q.    And at the top, the response to --

 9      Supplemental Response to Document Request 7.

10                  Do you see it?

11            A.    Yes.

12            Q.    I just want to make sure, so the

13      last sentence says:

14            "The authorized signatories do not include

15      Mr. Lang or Ms. Jander."

16                  But that's not accurate, right?

17            A.    If I'm reading the same thing you

18      are reading, and as I answered previously, I

19      know it's the intent to make me and Anabelle the

20      signatories and remove Mr. Lang as signatory,

21      but --

22            Q.    Not so far.

23            A.    Well -- yes.  I mean, I'm reading

24      the same thing you're reading and I previously

25      said that we're trying to do that, but it hasn't
```

1    been done yet.

2         **Q.   Okay.**

3

4

5

6

7

8

9

10

11

12

13

14                              Redacted

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                        Page 80

```
 1
 2
 3
                              Redacted
 4
 5
 6
 7                MR. DOYLE:  Let me turn your
 8           attention to Exhibit Number 8.
 9                [Exhibit 8 was marked for
10                identification.]
11                THE WITNESS:  All right.
12      BY MR. DOYLE:
13           Q.   So let me ask you to go through
14      these and let me know if these are the -- the
15      statements for the company from the Oriental
16      Bank account that we're talking about from
17      March 31 to September 30.
18                Can you just confirm that that's
19      what we've got here?
20           A    [Witness reviews document.]
21                Yes.
22           Q.   Okay.  So where were the employee
23      salaries being paid?  Where do they show up on
24      here?
25                A.   So I'm not trying to be disingenuous
```

```
 1   or misleading, I don't know.  They must be paid

 2   from the First Bank bank account.  You're asking

 3   questions that I should know the answer to

 4   and --

 5          Q.   Okay.  But they are not showing up

 6   here, right?

 7          A.   Right.

 8

 9

10

11

12

13

14

15

16

17                          Redacted

18

19

20

21

22

23

24

25
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                Page 82

```
 1
 2
 3                              Redacted
 4
 5
 6          Q.   Yeah.  So then there's a three --
 7     the third one, April 5, is a payment to a
 8     Barclay card -- US credit card.
 9               What is that?
10          A.   That is a personal card of Kendell
11     and it's reimbursement for the purchase of
12     equipment.
13          Q.   Okay.  So that's -- you had talked
14     about the USAA card was also his?
15          A.   Yes.
16          Q.   So -- all right.
17               So even though the writ of
18     garnishment had been served, Mr. Lang paid
19     himself back from the company?
20          A.   Yes.  I've already said that the
21     company has reimbursed Mr. Lang for expenses
22     that he advanced on behalf of the company.  It
23     did not include compensation or any --
24          Q.   No, I understand.  But I just want
25     to make sure that this is the -- this is the
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 83

1    bank statement that shows some of these

2    reimbursements to him.

3            A.    Yes.

4            Q.    And he's making those decisions on

5    behalf of the company.

6            A.    In April, yes.

7

8

9

10

11

12

13

14

15                          Redacted

16

17

18

19

20

21

22

23

24            Q.    All right.  And so the May 10

25    Barclay card payment, that's, again, Mr. Lang's

1      card?

2              A.    Yes, same -- same answer.

3              Q.    For May 13, there is Edward's Food

4      Market in Rincón.

5                    Would that be for the company?

6      Would that be a personal expenditure?

7              A.    It would be for the company.

8              Q.    Why do you say that?

9              A.    Because if Mr. Lang were using this

10     account to buy his personal groceries, it would

11     seem more -- we would be seeing more charges

12     than a single charge, in this case, for $33.81.

13             Q.    So you're just making that inference

14     based on the lack of other personal

15     expenditures?

16             A.    I'm making that inference.

17

18

19                           Redacted

20

21

22             Q.    Okay.  So on May 18, there's

23     another -- there's a $1,900 payment to a credit

24     card of Mr. Lang; is that correct?

25             A.    Yes.

1

2

3

4

5

6

7

8

9

10

11

12

13                    Redacted

14

15

16

17

18

19

20

21

22

23

24

25          Q.   Okay.   The June 21, Venmo, do you

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                      Page 86

1    know what that would be?

2              A.   I'm afraid I don't know off the top

3    of my head what that is.

4              Q.   So does the company ordinarily pay

5    its expenses through Venmo -- or any expenses?

6              A.   From time to time, my guess is this

7    could be payment of the services to an

8    individual.  I am sorry, I don't know this one

9    specifically.

10             Q.   Okay.  So you don't know.  Okay.

11   That's fine.

12             And, again, the June 28 payment of

13   $5,300, that's for Mr. Lang's credit card.

14             A.   Yep, that's the one we already

15   discussed.  That's specifically for the purchase

16   of a refrigerated display case.

17             Q.   And the $500 cash withdrawal on

18   June 29, do you know what that is?

19             A.   No.  I'm sorry.

20             Q.   Okay.

21

22

23                           Redacted

24

25

1

2

3

4

5

6

7

8

9

10

11                                    Redacted

12

13

14

15

16

17

18

19

20

21

22          Q.   Okay.  In June -- I'm going to the

23     June 30 to July 31 statement.

24          A.   Okay.

25          Q.   We have another Barclay card

1    payment.

2              That's, again, Mr. Lang's; is that

3    correct?

4         A    [Witness reviews document.]

5              Yes.

6         Q.   And do you know what the July 14,

7    $1,600 ACH payment is for?

8         A.   Let me check my notes.

9              We were in July, right?  July --

10        Q.   Yes.  Yes.

11        A.   I'm afraid I -- that's not one of

12   the ones that I researched.

13        Q.   Okay.  And, again, we have a cash

14   withdrawal and -- and we have a Venmo payment.

15             So you don't really know what those

16   are about.

17        A.   I don't know every transaction, I'm

18   sorry.  And I agree that $500 would be a lot of

19   money to me or just about anyone, but in the

20   scope of our corporate expenses, it's not a

21   large sum.

22        Q.   No, I understand.

23             And then there's another Venmo

24   payment on July 30.

25        A.   Same answer:  I don't know the

 1    details with every one.  These are consistent

 2    with corporate expenses.

 3         **Q.   Right.**

 4         A.   I did ask if these were sent to

 5    Mr. Lang and he said no.

 6         **Q.   Oh, wait.  You did ask if the Venmo**

 7    **payments were to him?**

 8         A.   I'll revise my answer.  I asked if

 9    any payments in any of these bank accounts, bank

10    statements were to Mr. Lang and he said no.

11              So I did not research those Venmo

12    payments specifically.  Same answer as before,

13    but I asked broadly if there were any payments

14    here to Mr. Lang because I wanted him to tell me

15    specifically yes or no, and he said no.

16         **Q.   Even though he was getting the**

17    **credit card reimbursements?**

18         A.   Stipulating that those were specific

19    reimbursements.

20         **Q.   Right.  But --**

21         A.   I'm sorry if I'm confusing the

22    issue.

23              I -- after identifying certain

24    specific reimbursements for specific purchases,

25    I asked him pointblank:  Are any of these

```
1    payments to you personally?

2              And the answer is no.

3

4

5

6

7

8

9                       Redacted

10

11

12

13

14

15

16        Q.   Okay.  And then there's a --

17   August 18 -- I'm sorry.

18              August 19, there's a payment, again,

19   that's to --

20        A.   Yes.

21        Q.   -- Kendell Lang.

22        A.   Well, reimbursement for an expense,

23   a corporate expense.

24        Q.   Well, yeah, but the -- you know,

25   reimbursement to Kendell Lang?
```

DEPOSITION OF  ELLIOT F. PRATT
30(b)(6)                                    Page 91

1

2

3

4

5

6

7

8

9

10

11

12

13                              Redacted

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                        Redacted

6

7

8

9        Q.   Okay.  On August 30, there's another

10   payment to the USAA credit card and that's for

11   Mr. Lang?

12        A.   Yes, I see that.  And the same

13   answer, and I will answer in advance:  I don't

14   know specifically what that one was for.

15        Q.   Sure.

16             Now, going to the August 31 to

17   September 30 statement.

18        A.   Yes.

19        Q.   And then on September 28, that's a

20   payment to Mr. Lang's card?

21        A.   Same -- answer as before:  Yes.

22

23

24                   Redacted

25